On Rehearing.
MONROE, J.
The majority of the court, adhering to the view that plaintiffs are entitled to prosecute this suit in their own names for the recovery of the whole amount alleged to be due, but entertaining some doubt upon the questions of fact upon which the case turns, a rehearing was granted for the further consideration of these questions, and the present inquiry will be confined thereto, although the writer of this opinion still holds to the view that, under the law regulating practice in this state, whatever may be the rule elsewhere, plaintiffs have no standing to prosecute in their own names a suit for the recovery of the amount which has already been paid them by the insurance companies, and to their right to recover which they had subrogated those companies. Proceeding, now, to the matter in hand, plaintiffs allege that said premises (referring to their house) “were properly wired,” etc., for lighting, and that the fire which damaged it was caused by the negligence of defendant’s employés in permitting the service wires, which they were removing, to come in contact with wires carrying an electric current *573 of higher pressure than the installation in the house was intended for, or could stand.
Considering, again, the testimony bearing upon the first of’these allegations, we find that Douglas, plaintiffs’ expert, testifies that the lighting appliances were installed in 1896 (when the house was built), according to the rules then in force ; that about the year 1899 a number of houses in the neighborhood were destroyed, or damaged, by fire, resulting, as we understand the testimony, from electricity carried into them by means of wiring; and that he made another inspection of the house at that time. Being asked whether he made any change in the installations, as the result of the inspection, his answer was:
“We repaired the damage.”
Reed, another expert, called on behalf of the plaintiffs, says:
“I inspected their residence at the time that we had those dreadful fires along St. Charles avenue, about ten years ago. * :s * As .well as I can remember, there was some damage done at that time.”
1-Ie further says that, after the damage was repaired, he made a “Wheatstone bridge test,” and found that “the installation was above the standard.” He adds:
“That was done before the electric current was again connected with the building.”
McConnell, an inspector for the insurance companies and a witness for plaintiffs, testifies that the rules regulating the wiring of buildings have been changed during the past few years; that he was in the house whilst the fire, out of which this litigation arises, was in progress, and that he looked about in order to ascertain how it originated; that he understood that the installation was approved at the time that it was established, but, that it would not be approved to-day, because of changes that have been made in the National Electric Board’s code. Being pressed to specify some of the defects that he found, he mentioned “brass armored conduits,” and said:
“Some of the fixture wiring is smaller than is called for, to-day, on account of safety.”
Mr. Borde, another of plaintiffs’ expert witnesses, also testified that he found brass armored conduits in the installation, and that they are not now allowed in new installations, though the board has not ordered them out of the old installations. Being asked:
“It is not considered safe?”
• — he replied:
“No, sir; not from their [the board’s] point of view.”
Mr. Black, an expert called on behalf of defendant, testified that the installation was not in accordance with the rules in force 10 years ago; that he found a number of defects some of them dangerous, and he proceeded to specify: Absence of solder in joints; lack of proper branch blocks, where the size of the wire changed; the use of a very unsatisfactory form of fuse blocks at the fixtures generally known as bulbs; the use of brass, around conduits, particularly where it comes in contact with grounded pipes; and the absence of tablet boards, for branching the circuits. There was no attempt to rebut the testimony thus given by Mr. Black, and, when considered in connection with that given by plaintiffs’ own witnesses, it seems to us to show that the installation was defective. Considering, also, the testimony bearing upon the charge which plaintiffs make, that defendant’s employes, in removing the service wires which conducted the electricity for lighting purposes into the house in question, “carelessly and negligently” permitted them to come “in contact with a wire, or wires, carrying an electric current of a greater and higher pressure than the wires and electric fixtures in the said premises were designed to, and could carry,” we find as follows: Plaintiffs’ house was situated on (what, for convenience, we shall call) the “north side” of St. Charles avenue, *575 facing to the south, and was supplied with ■electricity, for lighting, by means of two service wires, which were strung from a pole, planted on the south side of the neutral ground, to a telephone pole, planted on the north side of the neutral ground, and which ■extended from the telephone pole into the house. The pole first mentioned supported defendant’s main lighting and power wires, and, upon the neutral ground, which separated It from the telephone pole, and which is, perhaps, 30 or 40 feet wide, there are two car tracks, above which there are, suspended, feed wires which supply the cars with their motive power, and which, as we understand It, obtain the power so supplied from the main wire, which is strung on the poles planted along the south side of the track. •One of these poles, being the first above mentioned, became rotten, and it was decided to .substitute another, at a point about 100 feet ■further to the westward, thereby necessitating the .disengagement from the old pole of 'the wires which were supported by it, and their attachment to the new pole, when erected, or, in the case of the service wires here •in question, the substitution of new wires, since the service wires then in use were too •short to have reached the new pole, 100 feet •further away. The job thus described was undertaken by a gang of defendant’s men, under the direction of Magner, as foreman, ■on the morning of February 18, 1907, and the first work done was the digging of a hole, and the preparation of the new pole, and its •erection therein. This work was accomplished before 10:30 o’clock a. m., and at or about that hour one of the men, Rankin, climbed upon the rotten pole for the purpose of disengaging the service wires leading into plaintiffs’ house (and the other wires, as well), whilst two other men stood on the ground, below him; one of them, Dooley, holding up the rotten pole, and the other, Himes, holding the hand line, or rope, which was to be used as will be stated a little later. Magner then climbed on the telephone pole, and another man, Conrad, took his position on the ground below him. Rankin then cut one of the service wires, and there was tied to its end one end of the hand line, or rope, the other end and bight of which was in the hands of Himes, and he (Rankin) proceeded to pay out the wire (and rope) which Magner was to pull in; the proper thing being for them, between them, to have kept the wire and rope taut, and not to have allowed the wire to sag down upon the feed wires. And the same course was pursued with reference to the other service wire, both of them having been let down by Magner, as he received them, to Conrad, who received them, in turn, and coiled them at the foot of the telephone pole. Subsequently, when they had both been passed over to the north side of the neutral ground, they were cut off from the telephone pole, and were thrown, by Conrad, into a wagon and taken (by Peter) to the defendant’s stable, from which they are said to have been sold as junk. Rankin, Dooley, Himes, Magner, and Conrad were the only persons who were handling the service wires, and were the only persons who were likely to have observed whether, in handling them, they allowed them to come in contact with the feed wires, over which they were passed, and it might reasonably be expected that one of them would be able to state, with some sort of certainty, whether such contact was allowed or not.
Rankin, who was paying the wire out by means of the rope, was asked: “Do you know whether the wire ran across the feeder?” And he answered: “No, sir.” It might possibly, and under different circumstances, be supposed that, in answering as he did, the witness meant to say, not that he did not know whether the wire ran across the feeder, but that as a fact the wire did not run across the feeder. Subsequently, however, the same *577 question was propounded to Conrad, to wit: “Do you know if that line that came across came in contact with the trolley or feeder wires?” To which the witness answered: “After the wires came over, the hand line was let go from the opposite side and got tangled.” He was then asked: “Q. The wire itself, do you know whether that came.in contact with the trolley ?” and he replied: “No, sir.” He was then asked: “If it had come in contact with the trolley, would you have known it?” And he answered: “Well, it would have ¡burned my hands.” It is evident, therefore, that the answer, “No, sir,” in Conrad’s case, was understood to be a correct and categorical answer to the question as propounded, and we think it should be assumed that it was so understood in Rankin’s case. Prom which we conclude that Rankin said, and meant to say, that he did not know whether the service wire ran across — -i. e., touched — the feeder or not. Conrad, as we have seen, in answer to the question, “If it had come in contact with the trolley, would you have known it?” replies, “Well, it would have burned my hands.” But that was a mere inference, and unfounded, for the service wires did not reach Conrad until they had been drawn by Magner clear of the feeder wires, and, having been severed from the main wire, they could not have burned his (Conrad’s) hands. In fact, they would not, necessarily, have burned his hands, even if he had received them at a time when they were resting on the feeders, since they were, for 'the most part, if not entirely, covered with rubber, and the electric current would have reached his hands only if it had happened that a bare place on the service Wire touched the feeder at the instant that another baie place touched Conrad’s bare hands.
Dooley was not questioned upon the subject of the possible contact between the service and the feeder wires.
Himes, like Rankin and Conrad, was asked: “Do you know whether- they [the service wires] touched on the" feeder?” And he answered: “No, sir.” He was subsequently asked: “Were those service. wires brought in contact with the main electric light wires in any way?” To which he replied': “No, sir.” But the main electric light wires were not the wires over which the service wires were passed. They wére wires which were strung along the poles, on the south side of the neutral ground.
Coming, now, to Magner, who received the wires, on the north side of the neutral ground, while Rankin paid them out, on the south side, we find that he was asked: “Did you drag that wire over the feeder?” To which he answered: “No, sir.” It may be that, if he had been asked, “Did either of those service wires, while they were being passed over the feeders, come in ■ contact with either of the feeders?” he would have made the same answer; but we have no means of knowing that. We should have supposed that he would have known with certainty whether it was Rankin or some one else who tied the rope to the service wires, and yet, as part of his answer to the question, “Who moved the service wires?” he said, “I think that he tied the rope on the service wires. He had a man on the ground to hold it.” If, however, he was mistaken about Rankin tying the rope to the service wires, and if, as a fact, the man on the ground performed that function, then the ends of the service wires must have been dropped to the ground, with the result that for a time, and at the points where they crossed, they rested on the feeders.
There was a witness called by defendant, named Peter, who was employed to drive the wagon which was used by defendant’s workmen, and who was examined for the purpose of showing that the service wires, after both of them had been drawn over to the north side of the neutral ground, were cut off from the telephone pole,- thrown into *579 the wagon, hauled away, and finally sold as junk.
The examination proceeded as follows:
“Do you know what became of the wires, finally? A. Yes; rolled up in a coil and put up alongside of a fence. Q. Did they stand there all day? A. Until a quarter to 12, when they cut them down and Mr. Conrad brought them to the wagon and handed them to mo. Q. Then what did you do? A. When they handed them to me, I put them in the scrap portion of the wagon. Q. What became of them after that? A. I hauled them to the stable, and the next morning I put them in the scrap pile. Q. Do you know whether those wires came in contact with the trolley ? A. No; they didn’t come in contact with the trolley' or the feeder wire. Q. At the time of the fire were there, or not, any wires leading from the trolley across St. Charles avenue? A. No; there were none. Q. Was, or was not, the Burke residence, at the time, connected by feed service wires? A. Not at that time: no. Q. Were there, or were there not, any feed service wires between the telephone pole and the Burke house? A. At the time they were laying on the ground. Q. But, leading from the Burke house and reaching to the telephone pole, were there any? A. No, sir.”
From this examination, it seems to us; to say the least, doubtful whether the witness intended to testify that, whilst the sendee wires were being passed over the feed wires, there was no contact, since his attention had not been directed, by the previous questions, to that particular occasion. Moreover, he had nothing to do with the passing over of the wires. There appears to have been no reason why he should have watched the men who were . engaged in that work; and we should be disposed to doubt, no matter what may have been his intention in testifying, whether he was in a position to know more than they have testified to as to the manner in which the work was done, particularly as he falls into a patent error in saying that, at the time of the .fire, there were no service wires running from the telephone pole to the house; those wires, according to all the witnesses, not having been removed until after the fire was under way. On the whole, upon this branch of the case, our conclusion is that defendant has failed to prove, or to make it probable, that in the process of removing them the service wires leading into plaintiffs’ house were not allowed to come in contact with the feed wires. The evidence tending to show that there was-such contact, and that the fire in question was the result, including the inference which may be drawn from the unsatisfactory testimony given by the men who were handling the wires, is indirect and circumstantial. Mrs. Swarbriek, her sister, Mrs. Douglas, and their hairdresser, Mazura McOue, were sitting in Mrs. Swarbrick’s room between 11:30 and 12 o’clock, when they heard what Mrs. Douglas and Mazura described as a “crash,” and Mrs. Swarbriek as “a terrific noise on the side of the house,” which induced Mrs. Douglas to raise one of the windows and look out into the street. In the course of the examination of the witnesses named, Mrs. Douglas described the noise as a “rumbling or falling sound,” and said that it was above her. And it is argued that it was produced by the introduction, into the lighting installation of the house (by means of contact between the service and feeder wires), of the current carried by the latter. The evidence to the effect that the service wires were cut and removed at or about 10:30" o’clock, and that the noise was not heard until between 11:30 and 12 o’clock, is, however, wholly uncontradicted. Beyond that, we rather infer, from the testimony on the subject, that the noise appeared to the witnesses to come from the outside of the house,, whereas the theory propounded assumes an explosion or “rumbling” within the house-Again, we have expert testimony to the effect that the introduction of the more powerful current of electricity would not produce a “rumbling,” but would produce a “hissing,” sound. We think it possible,' therefore, that the noise referred to has nothing to do with. *581 the case. We, however, pass on -to other matters. A minute or two after the noise had been heard, Mrs. Swarbrick thought she smelled smoke, and, going into the attic to investigate, she found it filled with smoke, and so reported to Mrs. Douglas, who telephoned to the fire patrol and to Mr. Swarbriek, and then called, out of the window, to the men in the street, that the house was on fire. She. then went downstairs, and some of the men came in and went upstairs, and the testimony of all the witnesses concurs to the effect that, evidence of fire having been discovered about a bracket (combination, gas and electricity) which came out from the wall between the hall and parlor doors, an opening was made in the wall with an ax, and flames (the first fire that was seen) immediately burst out. An effort was made by those present to subdue the flames, by throwing water through the opening made by the ax, but without success, and the fire gained headway very rapidly, so much . so that in a very little while the whole of the upper part of the house was involved. Plaintiffs’ expert witnesses (Borde and McConnell) testify that, in their opinion, based on the examination made by them, the cause of the fire was the introduction into the installation of the 550-volt current of electricity, carried by the feeder wires of the railway, or some similar current, ¿nd that it could not have originated in any other w,ay. Defendant’s expert (Black) testifies that his examination of the premises disclosed no such indications, and he propounds a theory of his own, which seems to us by no means as probable as that propounded by plaintiffs. Defendant's ex¿>erts testify that all installations designed to carry currents of 230 volts, if. in proper condition, can carry the 550-volt current used to move the street cars, and plaintiffs’ experts seem to deny this; but we think it may be conceded for the purposes of the case. We have found that the installation here in question was not in proper' condition, and we do not understand any of the witnesses to say that a lighting installation, not in proper condition, can carry a 550-volt current without disastrous results. Quoad the defendant’s 550-volt current, however, the plaintiffs were under no obligation to keep their installation in proper condition. It seems to have served the purpose for which it was intended until the defendant’s servants undertook the removal of the service wires, and it appears to us reasonably certain that if, in the course of that work, those wires were allowed to take on the extra current carried by the feeders over which they were passed, the' fire must have resulted. The service wires were passed over the feeder wires, according to the uncontradicted testimony of defendant’s witnesses, at 10:30 o’clock. The fire was discovered an hour or an hour and a quarter later; but, when discovered, it had gained considerable headway, and, as it appears to have originated -within a closed partition, it must have been smoldering for some little while. It seems to us highly probable, therefore, that it originated at the very time that Rankin and Himes and Magner were handling the service wires, or were passing them over the feeder. Counsel for defendant dwell with emphasis on the failure of the plaintiffs to produce the physical proofs, which were in their possession, bearing upon their theory of the case; such, for instance, as the wiring of the house, by which it might have been ascertained whether the installation had been generally burned off. If, however, we correctly understood the testimony of defendant’s experts, the burning of the insulation would, generally speaking, have been confined to those wires, or places on wires, where it was insufficient. We are inclined to think, as to the evidence adduced on both sides, that it falls short of the possibilities of the occasion; but the jury had to take it *583 as they found it, and, so taking it, they reached the conclusion that the fire was attributable to the fault of the defendant. The burden rests on an appellant to show, to the satisfaction of this court, that the judgment of which he complains is erroneous. But, after a second, careful, and deliberate study of the evidence upon which the judgment here complained is predicated, we' feel no assurance that such is the case, or that' any judgment that we could render would come nearer doing justice between the parties.
It is therefore ordered that the decree heretofore rendered in this case be now reinstated and made the final judgment of the court.